**GATEWAY EASTERN RAILWAY CO., Plaintiff–Appellee,**

v.

**TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Defendant–Appellant.**

**No. 94–1575.**

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1994.

Decided Sept. 14, 1994.

James A. Fletcher (argued), Thomas J. Healey, Oppenheimer, Wolff & Donnelly, Chicago, IL, John H. Hustava, Collinsville, IL, for plaintiff-appellee.

James W. Erwin, Allen D. Allred (argued), Kenton E. Knickmeyer, Thompson & Mitchell, St. Louis, MO, for defendant-appellant.

Before POSNER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Gateway Eastern Railroad Co. ("Gateway Eastern") was assigned trackage rights by Conrail over a five-mile stretch of track owned by the Terminal Railroad Association of St. Louis ("TRRA"). Gateway Eastern sought to exercise these rights, but TRRA denied Gateway Eastern access to the track. Gateway Eastern consequently sought a temporary restraining order in an Illinois state court to allow it to exercise its rights under this agreement. The case was removed to federal district court. After a hearing, the court entered a preliminary injunction to allow Gateway Eastern to use the track pending the decision of an arbitrator. TRRA appeals. We now affirm with respect to the entry of the preliminary injunction and remand to permit the district court to make additional findings with respect to the amount of the bond.

I

BACKGROUND

A. *Facts*

On April 30, 1993, Gateway Eastern entered into a Purchase and Sale Agreement with Conrail. Under the terms of the agreement, it agreed to purchase from Conrail various assets, including two sections of track in the East St. Louis switching district. One of the sections runs from East Alton south to

"WR Tower"; the other section runs from "Q" Tower east to a location east of "Willows Tower," where the track joins Conrail track and runs into Conrail's .Rose Lake Yard.

The two sections of track purchased by Gateway Eastern are connected by a section of track owned by TRRA. In the Purchase and Sale Agreement, Conrail assigned to Gateway Eastern trackage rights which allowed Conrail to operate on TRRA's tracks at a fee considerably less than the ICC switching rate. The Purchase and ·Sale Agreement also provided that, after acquiring these rail properties from Conrail, Gateway Eastern would provide service to various industries in East Alton ("East Alton industries") located along the sections of track being sold to it by Conrail. Specifically, under the agreement, Gateway Eastern was to transport rail cars between those industries and Conrail's Rose Lake Yard.

The trackage rights that Conrail assigned to Gateway Eastern had been obtained by one of Conrail's predecessors. Under this agreement, Conrail was granted the right to operate its trains over TRRA's track between WR Tower and Willows Tower "solely in overhead or bridge service." Appellant's App. at 18a. Specifically, Conrail was authorized under the agreement to use TRRA's track "for the purpose of enabling it to move its local and or road trains" between WR Tower and Willows Tower. *Id.* "Local and or road trains" are defined as trains which either originate or terminate outside the switching limits of St. Louis and East St. Louis. *Id.* The agreement also precluded Conrail from using the track for the "purpose of ... performing intermediate switching service between railroads in the St. Louis–East St. Louis Switching District." *Id.* at 19a. Additionally, Conrail agreed that

> said track will not be used to establish a direct connection for the interchange of cars with any road in the St. Louis–East St. Louis and surrounding switching area, it being the intention of the parties that the direct connection now being made between the Rose Lake yard ... and other roads in said switching areas will not be expanded to additional roads by the use of said track.

*Id.* at 19a. Finally, the agreement stated that disputes between the parties under the agreement were to be settled through arbitration: "In case any question arises under this agreement upon which the parties hereto cannot agree, such question shall be settled by a disinterested arbitrator." *Id.* at 25a.

The present dispute arose when Gateway Eastern attempted to exercise its trackage rights under the assignment from Conrail. TRRA denied it access. Gateway Eastern then sought a temporary restraining order in state court to enforce its rights under the agreement, which the court granted. TRRA then removed the action to federal court.

### B. *District Court Proceedings*

After the case had been removed to the district court, Gateway Eastern moved for a preliminary injunction. The district court extended the temporary restraining order until it could hold a hearing on injunctive relief. TRRA in response moved to vacate the TRO. The district court conducted a hearing on TRRA's motion and took evidence on Gateway Eastern's motion for a preliminary injunction. The court denied TRRA's motion to vacate, but also required Gateway Eastern to post a $50,000 bond to secure TRRA against losses it might incur during the period of the TRO.

On the day of the hearing on the preliminary injunction, TRRA filed a memorandum in opposition to Gateway Eastern's request for a preliminary injunction. In that document, TRRA argued that Gateway's use of the trackage rights would violate the terms of the agreement. Gateway Eastern responded by invoking the arbitration clause in the agreement.

The district court granted Gateway Eastern a preliminary injunction and directed that TRRA allow Gateway Eastern to operate over TRRA's track "such [Gateway Eastern] trains as are in compliance with the 1966 agreement, e.g., those trains which are exclusively transporting cars between shippers and consignees located on [Gateway Eastern]'s trackage." Appellant's App. at 12a. In addition to granting the preliminary injunction, the district court also found that the

dispute between the parties over the trackage rights agreement was subject to arbitration and ordered the parties to "promptly confer with respect to the issue of arbitration." *Id.* Finally, the court required Gateway Eastern to post an additional $20,000 in security.

The day after the injunction was granted, TRRA refused to allow passage of a Gateway Eastern train over its track. The train was moving rail cars from the East Alton industries served by Gateway Eastern to Conrail's Rose Lake Yard. Gateway Eastern immediately filed a motion asking the court to find TRRA in contempt. As a result of this dispute, the district court clarified its previous order. As amended, the court's preliminary injunction specifically required TRRA to allow Gateway Eastern to operate over its track trains which are transporting cars between the East Alton industries located along Gateway Eastern's track and Rose Lake Yard, whether those cars are in Gateway Eastern's account or Conrail's account.

TRRA appeals from the grant of the preliminary injunction. TRRA first claims that the district court abused its discretion in granting the preliminary injunction. Second, TRRA claims that the district court erred in issuing the preliminary injunction in connection with arbitration. Finally, TRRA claims that the bond that the district court required Gateway Eastern to post was inadequate as a matter of law to protect TRRA from potential loss. We evaluate each of these in turn.

## II

## ANALYSIS

### A. Propriety of Preliminary Injunction

"This Court gives substantial deference to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors." *United States v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1407 (7th Cir.1990). However, "the more purely legal conclusions made by a district court in granting a preliminary injunction are subject to *de novo* review." *Id.*

Several factors are relevant in determining whether to grant a preliminary injunction. As a threshold matter, the moving party must establish that it has some likelihood of success on the merits. If the movant

> does show some likelihood of success, the court must then determine how likely that success is, because this affects the balance of relative harms.... The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.

*Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 387 (7th Cir.1984). It also must demonstrate that it will suffer irreparable harm if preliminary relief is denied, and that it has no adequate remedy at law to compensate it for its losses. Finally, the court must also take into account the public interest, the effect that the grant or denial of the injunction will have on nonparties. *Erickson v. Trinity Theatre*, 13 F.3d 1061, 1067 (7th Cir.1994). We shall discuss those aspects of this analysis that are disputed by the parties.

### 1. Success on the Merits

In order to prevail, Gateway Eastern must show some likelihood of success on the merits. TRRA contends that Gateway Eastern cannot show likelihood of success on the merits because Gateway Eastern is operating in violation of the agreement. TRRA maintains that the trackage agreement allows Gateway Eastern only "bridge" rights. TRRA states that "bridge" rights allow the user to operate on the "tracks of another railroad to move between two otherwise unconnected segments of the user's trackage." Appellant's Br. at 25. In TRRA's view, Gateway Eastern's use of TRRA's track does not in fact "bridge" two of Gateway's unconnected tracks. Therefore, it maintains, Gateway is not using the rights granted under the agreement. However, Conrail sold Gateway Eastern portions of track on each side of TRRA's track. TRRA's track does, therefore, appear to "bridge" two of Gateway Eastern's otherwise unconnected track.[1]

---

1. What TRRA seems to be arguing is that "bridge" rights can be used only to connect track

However, TRRA also points to the language in the trackage agreement prohibiting Conrail from engaging in a switching service. Specifically, the agreement states:

It is understood and agreed that Pennsylvania [Conrail's and Gateway Eastern's predecessor] will not use said track for the purpose of making or receiving deliveries directly therefrom, doing any local business, or performing intermediate switching service between railroads in the St. Louis–East St. Louis Switching District. It is further understood and agreed that said track will not be used to establish a direct connection for the interchange of cars with any road in the St. Louis–East St. Louis and surrounding switching area, it being the intention of the parties that the direct connections now being made between the Rose Lake Yard of Pennsylvania and other roads in said switching area will not be expanded to additional roads by the use of said track.

Appellant's App. at 19a. TRRA maintains that Gateway Eastern is in fact engaged in a switching service and in the interchange of cars. TRRA points to the language of the Switching Agreement and the Interchange Agreement between Gateway Eastern and Conrail as evidence that Gateway Eastern is engaging in such prohibited activity. Specifically, TRRA notes that the Switching Agreement expressly provides: "(d) Operation of [Gateway Eastern] on Conrail trackage for purposes of accessing the Delivery Tracks shall be governed by the Conrail–[Gateway Eastern] interchange agreement then in effect." Plaintiff's Ex. 10 at 3. TRRA then turns to the Conrail–Gateway Eastern "Interchange Agreement" referenced in the above language:

SECTION 2. *USE OF SUBJECT TRACKAGE*

Operating Rights herein granted are granted for the sole purpose of [Gateway Eastern] using same to access Conrail's Rose Lake Yard for the delivery and receipt of interchange traffic between the parties hereto, and [Gateway Eastern] shall not perform any local freight service whatsoever at any point located on the Subject Trackage, nor is [Gateway Eastern] permitted to ingress or egress at any point other than its connection to Conrail at Willows.

Appellant's App. at 38a. In short, TRRA takes the view that the documents governing Gateway's relationship with Conrail reveal on their face that Gateway is, by its usage of TRRA's trackage, providing a switching service in derogation of the agreement between Conrail and TRRA.

However, Gateway Eastern submits that TRRA's reading of the documents does not take into account the relationship between Conrail and Gateway Eastern. The Switching Agreement between itself and Conrail was designed to govern the relationship between Conrail and itself only when it acts as Conrail's agent in servicing the East Alton industries. The Switching Agreement anticipated other future commitments between the parties, and those, Gateway Eastern argues, were to be governed by the Interchange Agreement. Accordingly, the Interchange Agreement is drafted more broadly. Gateway Eastern further explains that "interchange" is a term of art that requires not

of a long-distance hauler, and therefore Gateway Eastern cannot be using TRRA's track to bridge portions of its track. We do not believe that this narrow view of bridge rights comports with common usage. In *Illinois Commerce Commission v. I.C.C.*, 819 F.2d 311, 312 (D.C.Cir.1987), the court explained the two types of trackage agreements:

Trackage rights agreements are arrangements by which one railroad company allows another to use its railroad tracks. These agreements can take one of two different forms. The owner railroad may allow the tenant railroad to serve freight customers along the leased track or may limit the tenant railroad to use of the track from one point to

another, withholding permission to serve customers along the route. The ICC refers to the first kind of agreement as "extension trackage rights transactions" and the latter kind as "bridge trackage rights transactions."

Thus, bridge rights stand in contrast to extension rights and describe an agreement whereby the right to service customers is not granted. The definition does not require that the "bridge" connect track of long-distance haulers (although this type of arrangement may be particularly appealing to long-distance haulers looking for new routes). Therefore, it would seem that Gateway Eastern's use of TRRA's track would constitute "bridge" rights.

only a physical transfer of cars, but also a transfer of cars on accounts. Consequently, the physical transfer of cars that takes place between Gateway Eastern and Conrail at Conrail's Rose Lake Yard when Gateway transports cars from the East Alton industries to the Yard do not qualify as an interchange as the term is used in the industry or in any of the agreements. Tr. 37. Finally, departing from the labyrinthine verbiage of the documents, Gateway Eastern offers a rationale grounded in its view of the economic realities of the situation. From its prospective, the original agreement between Conrail's predecessor and TRRA was designed to allow the predecessor to move its cars from the East Alton industries to its Yard without incurring a switching fee, but not to deprive TRRA of revenues arising in all other circumstances. Gateway Eastern's operations over the TRRA trackage are identical to the ones that Conrail performed previously. Gateway Eastern simply is doing, as Conrail's agent, what Conrail formerly did for itself. TRRA is not being deprived of any income that it contemplated receiving under the original agreement. Furthermore, argues Gateway, TRRA's interpretation would render nugatory the right of Conrail to assign its rights under the agreement. Any assignee would be a new carrier that would interchange cars with Conrail at its Yard.

The district court accepted Gateway Eastern's explanation of the terms of the agreement and its relationship with Conrail. It stated:

> The evidence adduced at the hearing revealed that Conrail and [Gateway Eastern]

**2.** Gateway maintains that

what TRRA is really contending is that because Gateway Eastern's use of its track has been in violation of the 1966 agreement, it is entitled to terminate that agreement. That contention might be relevant to a separate claim by TRRA (*i.e.*, a counterclaim) seeking a declaration of a right to terminate. However, that contention is not relevant to whether Gateway Eastern has made out a case on the elements of its claim. Appellee's Br. at 29. Gateway mischaracterizes TRRA's argument. Gateway Eastern is claiming breach of contract. The terms of the contract are critical to determining if a breach has occurred. If the contract does not allow Gateway Eastern the rights that it claims, then this is

have entered into a contract wherein [Gateway Eastern] picks up and drops off cars at either Conrail's Rose Lake Yards or at one of the East Alton facilities. There is no exchange of ownership of the cars to [Gateway Eastern]. [Gateway Eastern] does not bill the East Alton chemical companies for transport of the cars. At least arguably, there has not been a "transfer" of cars from Conrail to [Gateway Eastern]; therefore, no "interchange" has occurred.

Appellant's App. at 8a.[2]

We believe this is a plausible interpretation of the contract and establishes that Gateway Eastern has some likelihood of succeeding on the merits. Given the great harm that Gateway Eastern may suffer without the injunction, and the preventative measures that may be taken to lessen the potential harm to TRRA, we believe that Gateway Eastern has sustained its threshold burden with respect to this factor. *See Roland Mach.*, 749 F.2d at 387 (describing threshold burden on plaintiff with respect to likelihood of success on the merits and relationship of likelihood of success with the balance of harms).[3]

### 2. Irreparable Harm/Inadequate Remedy at Law

Gateway Eastern first must show that it will suffer irreparable damage, and that it has no adequate remedy at law if the preliminary injunction does not issue. The trial court found that Gateway Eastern had met its burden with respect to this factor. The district court determined that, if Gateway

relevant and central to determining whether the contract has been breached.

**3.** The district court did not address the effect of the injunction on the public interest. TRRA does not make a claim that the preliminary injunction should not have issued for reasons of public policy. Consequently, because the public interest aspects of a preliminary injunction are not dispositive, *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 n. 3 (7th Cir.1992), and because we are concerned primarily that issuance of the injunction will not disserve (as opposed to serve) the public interests, *Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795, 797 (7th Cir.1981), we do not believe this factor affects the above analysis.

Eastern were forced to pay the ICC rate, it would be forced either to absorb the cost or to increase its prices to customers. The court concluded that both options would result in irreparable harm. If Gateway Eastern were forced to absorb the increase, it would "go out of business in approximately 6 months." Appellant's App. at 8a. The alternative, passing on the increased cost to its customers, would result in loss of customers to a competitor railway or truck line, and consequently would injure the goodwill it had acquired from Conrail. In either situation, concluded the court, Gateway Eastern would suffer irreparable harm and could not be adequately compensated by money damages.

TRRA argues on appeal that Gateway Eastern has an adequate remedy at law and will not suffer irreparable harm. Gateway Eastern, maintains TRRA, can quantify the losses it will incur over the period of the injunction. Consequently, if Gateway Eastern ultimately prevails, an award of damages will compensate it adequately for its loss.

We cannot accept TRRA's argument. First, we note that we are bound by the district court's findings of fact unless clearly erroneous. The district court found that Gateway Eastern would suffer one of two harms if forced to pay the ICC rate: It would lose goodwill acquired from Conrail, or it would be forced out of business. There is support in the record for both conclusions. Certainly, the record supports the conclusion that the right to service Conrail's customers was a central aspect of the Purchase and Sale Agreement. In addition, financial data submitted by Gateway Eastern was sufficient to permit the district court to conclude that Gateway would suffer substantial losses if required to pay the ICC rate—losses that would drive Gateway Eastern out of business within six months. Tr. at 23. Thus, the findings of the district court were not clearly erroneous and shall not be disturbed. *Cf. International Kennel Club v. Mighty Star, Inc.*, 846 F.2d 1079, 1091 (7th Cir.1988) (evaluating district court's finding that "if an injunction did not issue the plaintiff would continue to incur damage to its good will and

reputation" according to clearly erroneous standard).

Furthermore, on this record, we cannot disturb the district court's conclusion that Gateway Eastern's loss of goodwill, or eventual demise, qualifies as irreparable harm for which there is no adequate remedy at law. We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages. *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 53 & n. 7 (7th Cir.1980). Additionally, although economic loss generally will not sustain an injunction, this court stated in *Roland Mach.*, 749 F.2d at 386, that a damages remedy may be inadequate if it comes "too late to save plaintiff's business." Consequently, we cannot say that the district court erred in concluding that Gateway Eastern would suffer irreparable harm for which there is no adequate remedy at law.

### 3. Balance of Harms

In reviewing the decision of the district court to grant the preliminary injunction, we must also look to its evaluation of the harm that the defendant may suffer compared to the harm suffered by the plaintiff.

> In deciding whether to grant a preliminary injunction, the court must also consider any irreparable harm that the defendant might suffer from the injunction—harm that would not be either cured by the defendant's ultimately prevailing in the trial on the merits or fully compensated by the injunction bond that Rule 65(c) of the Federal Rules of Civil Procedure requires the district court to make the plaintiff post.

*Roland Mach.*, 749 F.2d at 387. The district court did not abuse its discretion in finding that the balance of harms favored issuance of the injunction. TRRA will not suffer irreparable harm from the injunction, but only lost revenues (the difference between the ICC rate and the trackage agreement rate) from Gateway Eastern. If TRRA eventually prevails on the merits, an award of damages will compensate it for its losses. So long as an adequate bond is posted during the injunction, TRRA will not suffer irreparable harm.[4]

4. For a discussion of the adequacy of the injunc-

tion bond, *see infra* part II.C.

Consequently, the district court did not abuse its discretion in balancing the harms in favor of issuing the injunction.

### B. Issuance of the Injunction Pending Arbitration

█ TRRA maintains that the trial court erred in ordering the parties to arbitration and at the same time issuing a preliminary injunction. Essentially, TRRA urges this court to follow Merrill Lynch, Pierce, Fenner & Smith v. Hovey, 726 F.2d 1286 (8th Cir.1984), in which the Eighth Circuit held that a district court lacks the authority to issue a preliminary injunction when it determines that the matter should be submitted to arbitration under the Federal Arbitration Act. However, this holding is contrary to the weight of the authority in this and other circuits. Recently, in Merrill Lynch, Pierce, Fenner & Smith v. Salvano, 999 F.2d 211 (7th Cir.1993), this court stated:

> We agree with Merrill Lynch, however, that the weight of federal appellate authority recognizes some equitable power on the part of the district court to issue preliminary injunctive relief in disputes that are ultimately to be resolved by an arbitration panel. In Sauer–Getriebe, [KG v. White Hydraulics, Inc., 715 F.3d 348 (7th Cir. 1983) ], this court ordered the district court to enjoin the defendant's actions pending arbitration where the plaintiff satisfied the requisites for obtaining such relief under the four usual factors justifying injunctions.... Though Salvano and Coon argue that Sauer–Getriebe is distinguishable from the present case on several grounds, the subsequent circuit cases reaching like results reinforce Sauer–Getriebe's conclusion that district courts are not precluded as a general matter from issuing preliminary injunctive relief pending arbitration.

Id. at 214 (citations omitted). Absent compelling reasons, we shall not abandon our established precedent. In its brief, TRRA merely repeats arguments that this court previously has addressed and rejected. Consequently, we reaffirm Salvano and uphold the district court's grant of preliminary injunctive relief in the face of arbitration.[5]

### C. Sufficiency of the Bond

█ Finally, TRRA argues that the district court abused its discretion in requiring Gateway Eastern to post a bond of only $70,000. TRRA claims that because it is losing $9,300 per week (based on 28 cars per day), the bond is inadequate to cover the damages it may sustain during the pendency of the injunction. We evaluate the adequacy of an injunction bond for an abuse of discretion. Hill v. Xyquad, Inc., 939 F.2d 627, 632 (8th Cir.1991).

Federal Rule of Civil Procedure 65(c) provides that:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The rule, we have stated, makes security mandatory, see American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 597 (7th Cir.1986), but also anticipates the exercise of discretion in determining the amount of the bond to be posted, Rathmann Group v. Tanenbaum, 889 F.2d 787, 789 (8th Cir.1989). Although we believe it is possible that requiring an initial bond of $70,000 was within the district court's discretion,[6] the district court never articulated the reason for requiring this amount.

---

5. TRRA seeks to distinguish this case from Salvano on the ground that the contract at issue in Salvano contained a provision explicitly allowing for preliminary injunctive relief. In a footnote, TRRA then admits that Salvano does not indicate whether the agreement at issue in that case contained such a clause. Appellant's Br. at 37 n. 14. Whether or not the contract in Salvano contained a preliminary injunctive clause, it is clear that our holding in that case was not predicated on any contractual terms between the parties.

6. Gateway Eastern points out that at the preliminary injunction hearing, TRRA stated that Gateway Eastern was only moving fifteen (a number which TRRA does not dispute in its reply) cars per day over the tracks. Given this figure, the bond would cover TRRA's potential losses for over three and one-half months. The district court may have believed that the dispute would be solved within this time frame and therefore

[T]he "abuse of discretion" standard does not mean no review at all. It simply means that we shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one could expect a reasonable trial judge to select.

*United States v. Koen,* 982 F.2d 1101, 1114 (7th Cir.1992). Because the district court has provided us with no explanation for its decision to set the bond at the chosen figure, it is impossible for us to determine whether or not the $70,000 bond was "within the range of options from which one could expect a reasonable trial judge to select." *Id.* Consequently, we remand for a more definite statement of findings on this issue. *Hill,* 939 F.2d at 632 ("Although we allow the district court much discretion in setting bond, we will reverse its order if it abuses that discretion due to some improper purposes, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations."). We note that it is within the district court's discretion to increase or decrease the amount as necessary to comport with its findings, or to account for changed circumstances.

### Conclusion

For the foregoing reasons, we affirm the judgment of the district court with regard to the preliminary injunction and the referral to arbitration. We remand, however, for more definite findings with regard to the amount of the bond. Gateway Eastern may recover its costs in this court.

AFFIRMED IN PART AND REMANDED IN PART.

that TRRA would be adequately insured against    loss.